IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2019 AUG 26 AM 11: 41

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
        DEPUTY

| | |
|---|---|
| W. H. WALL FAMILY HOLDINGS, LLLP, § § | |
| PLAINTIFF, § § | |
| V. § § | CAUSE NO. 1-18-CV-00303-LY |
| CELONOVA BIOSCIENCES, INC., § § | |
| DEFENDANT. § | |

# MEMORANDUM OPINION AND ORDER REGARDING CLAIMS CONSTRUCTION

Before the court in the above-styled and numbered cause are Plaintiff W. H. Wall Family Holdings LLLP's Opening Claim Construction Brief filed December 27, 2018 (Doc. #46); Defendant Celonova Biosciences, Inc.'s Opening Claim Construction Brief filed December 27, 2018 (Doc. #45); Plaintiff's Responsive Claim Construction Brief filed January 11, 2019 (Doc. #47); Defendant's Responsive Claim Construction Brief filed January 12, 2019 (Doc. #49); the parties' Revised Joint Claim Construction Statement filed January 18, 2019 (Doc. #51); and the parties' claim-construction presentations.

The court held a claim-construction hearing on January 22, 2019. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). After considering the patent and its prosecution history, the parties' claim-construction briefs, the applicable law regarding claim construction, and argument of counsel, the court now renders its order with regard to claim construction.

I.  Introduction

The court renders this memorandum opinion and order to construe Claim 30 of United States Patent No. 6,974,475 ("the '475 Patent") entitled "Angioplasty stent." Plaintiff W. H. Wall Family Holdings LLLP ("Wall") is the owner of the '475 Patent, which relates to a prosthesis in the form of a stent. Specifically, the asserted claim of the '475 Patent is directed to a method of placement of a stent for maintaining a minimum opening through an artery "or the like." Wall alleges that Defendant Celonova Biosciences, Inc. ("Celonova") infringes claim 30 of the '475 Patent through making, using, offering for sale, selling, or importing infringing products.

II.  Legal Principles of Claim Construction

Determining infringement is a two-step process. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996) ("[There are] two elements of a simple patent case, construing the patent and determining whether infringement occurred . . . ."). First, the meaning and scope of the relevant claims must be ascertained. *Id.* Second, the properly construed claims must be compared to the accused device. *Id.* Step one, claim construction, is the current issue before the court.

The court construes patent claims without the aid of a jury. *See Markman*, 52 F.3d at 979. The "words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . ." *Id.* at 1313. The person of ordinary skill in the art is deemed to have read the claim term in the context of the entire patent. *Id.* Therefore, to

ascertain the meaning of a claim, a court must look to the claim, the specification, and the patent's prosecution history. *Id.* at 1314–17; *Markman*, 52 F.3d at 979.

Claim language guides the court's construction of a claim term. *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent . . . ." *Id.* Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.* at 1314–15.

Claims must also be read "in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582). In the specification, a patentee may define a term to have a meaning that differs from the meaning that the term would otherwise possess. *Id.* at 1316. In such a case, the patentee's lexicography governs. *Id.* The specification may also reveal a patentee's intent to disavow claim scope. *Id.* Such intention is dispositive of claim construction. *Id.* Although the specification may indicate that a certain embodiment is preferred, a particular embodiment appearing in the specification will not be read into the claim when the claim language is broader than the embodiment. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

The prosecution history is another tool to supply the proper context for claim construction because it demonstrates how the inventor understood the invention. *Phillips*, 415 F.3d at 1317. A patentee may also serve as his own lexicographer and define a disputed term in prosecuting a patent. *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004). Similarly, distinguishing the claimed invention over the prior art during prosecution

3

indicates what a claim does not cover. *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378–79 (Fed. Cir. 1988). The doctrine of prosecution disclaimer precludes a patentee from recapturing a specific meaning that was previously disclaimed during prosecution. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). A disclaimer of claim scope must be clear and unambiguous. *Middleton, Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002).

Although "less significant than the intrinsic record in determining the legally operative meaning of claim language," the court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (internal quotations omitted). Technical dictionaries and treatises may help the court understand the underlying technology and the manner in which one skilled in the art might use a claim term, but such sources may also provide overly broad definitions or may not be indicative of how a term is used in the patent. *See id.* at 1318. Similarly, expert testimony may aid the court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms . . . ." *Id.* Extrinsic evidence may be useful when considered in the context of the intrinsic evidence, *id.* at 1319, but it cannot "alter a claim construction dictated by a proper analysis of the intrinsic evidence," *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1139 (Fed. Cir. 2004).

**III. Discussion**

*A.   Disputed Terms*

The parties dispute the construction of five terms. Each disputed term is discussed separately.

1. "coating"

The parties' proposed constructions of this term, as used in Claim 30 of the '475 Patent, are listed in the following table:

| Wall's Proposed Construction | Celonova's Proposed Construction |
|---|---|
| "a selectively evaporable covering; a temporary or permanent layer of a substance applied to a surface"<br><br>Alternatively, no construction necessary beyond | Indefinite<br><br>Alternatively, "material applied to the mesh in order to define openings throughout the mesh" |

Celonova argues that the term "coating" is indefinite, because it is unclear in Claim 30 whether the "coating" itself is "defining a plurality of openings throughout the mesh." Alternatively, Celonova argues that, if the term is not indefinite, the term should be construed to mean that the coating is a material applied to the mesh in order to define openings throughout the mesh. Wall contends that the term "coating" would be understood by a person of ordinary skill in the art and should be given its plain and ordinary meaning, or the term should be construed as "a selectively evaporable covering; a temporary or permanent layer of a substance applied to a surface." The court agrees with Celonova's construction of the term.

A claim is indefinite if it does not reasonably inform a person of ordinary skill in the art of the claim scope. *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1383–84 (Fed. Cir. 2005). "Claim language employing terms of degree has long been found definite where it

provided enough certainty to one of skill in the art when read in the context of the invention." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014). Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. *Phillips*, 415 F.3d at 1314; *see also Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent.").

The court concludes that the term "coating" is not indefinite and construes it to be "material applied to the mesh for defining a plurality of openings throughout the mesh." Claims 25 and 28 of the '475 Patent consistently refer to "a method of placement of a sleeve . . . comprising: providing a radially collapsed sleeve formed in a mesh defining a plurality of openings throughout the mesh . . . and a coating applied to the mesh for defining a plurality of openings . . . .". The language in Claim 30 is very similar: "A method . . . providing a sleeve formed in a mesh and a coating applied to said mesh and defining a plurality of openings . . . ." Therefore, the term "coating" in Claim 30 is not indefinite when it is construed consistently with its appearance in Claims 25 and 28, and a person of ordinarily skill in the art is reasonably informed that "coating" means "material applied to the mesh for defining a plurality of openings."

Wall contends no construction for "coating" is necessary because the term is used consistent with plain and ordinary meaning. A court may depart from the plain and ordinary meaning of a claim term in only two instances: lexicography and disavowal. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). Because the patentee has limited the term in the claims of the '475 Patent, the term requires construction beyond its plain and

ordinary meaning. Wall has provided no evidence that the use of "coating" in Claim 30 should be attributed a meaning different from that of Claims 25 and 28.

Wall also asserts that the purpose of the coating is not to define the openings, and "defining a plurality of openings throughout the mesh" means that the openings in the mesh are not covered by the coating. To support this assertion, Wall cites Figure 5 of the '475 Patent and portions of the specification: "the network 31 is simply coated with the material 32 so that openings 34 are distributed throughout the material." '475 Patent, 3:54–52. The court is not persuaded. "The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims." *Markman*, 52 F.3d at 980. It is unclear whether the part of specification cited by Wall indicates that the purpose of the coating is to define a plurality of openings throughout the mesh. However, because the patentee has clearly limited the term "coating" to that purpose in the claims, the court need not to determine this issue. Further, Wall itself also states in its response brief that "The coating is applied to the mesh in a way that defines the boundaries of the openings."

Wall further requests that the court to construe the term "coating" as "a selectively evaporable covering; a temporary or permanent layer of a substance applied to a surface." Wall offered no support in the '475 Patent or its prosecution history to support this construction. Wall argues that those of ordinary skill in the art would readily understand the term as what it is proposing, citing a scientific article as evidence: Xiaodong Ma; Tim Wu; Michael P Robich, *Durg-eluting Stent Coatings*: Interventional Cardiology, 2012;4(1): 73–83. Celonova responds by arguing that the article was published in 2012, nearly 25 years after the '475 Patent was filed, and therefore is irrelevant to the claim construction of the '475 Patent. The court agrees. The ordinary and customary meaning of a claim term is the meaning that the term would have to a

person of ordinary skill in the art in question at the time of the invention, in other words, as of the effective filing date of the patent application. *Phillips*, 415 F.3d at 1313; *See also PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005) (meaning of claim "must be interpreted as of [the] effective filing date" of the patent application).

Therefore, the court concludes the construction of "coating" to be: **material applied to the mesh for defining a plurality of openings throughout the mesh.**[1]

2. "radially collapsed"

The parties' proposed constructions of this term, as used in Claim 30 of the '475 Patent, are listed in the following table:

| Wall's Proposed Construction | Celonova's Proposed Construction |
| --- | --- |
| "moved inwardly toward a common center" | "radially collapsed position that is not deformed beyond the sleeve's elastic limit" |

The parties dispute whether the patentee limited the scope of this term during the '475 Patent's prosecution. Wall asserts that its proposed construction would be well understood by those of skill in the art and it is consistent with plain and ordinary meaning of the term. Celonova contends that the patentee disclaimed deformable stents when the patentee distinguished radially collapsible and deformable sleeves to overcome rejections from the United States Patent and Trademark Office ("USPTO").

The court concludes that the term "radially collapsed" requires no construction because its meaning is apparent from the context in which it is used in the claims. "[W]e look to the words of the claims themselves . . . to define the scope of the patented invention." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Claim 30 of the '475 Patent

---

[1] Throughout, the **bolded** claim terms indicate the court's adopted construction.

states: ". . . mounting the sleeve in a radially collapsed position on the catheter . . . radially expanding the sleeve in the position of the lumen where the minimum opening in the lumen is to be maintained . . . ." Reading within the claim, it is logical to conclude that a person of ordinary skill in the art will understand the claimed stents do not deform beyond the sleeve's elastic limit, because a radially collapsed sleeve is not capable of returning to its expanded position if it was deformed beyond its elastic limit.

The specification of the patent further supports that no construction of the term beyond its ordinary and plain meaning is necessary. For example, the patentee states in the abstract of the '475 Patent: "The prosthesis can be inserted while in a collapsed position, then expanded and locked at the larger diameter." Also, the '475 Patent describes an embodiment where the hook arrangement is disengaged after continuous expanding, thereby causing the stent to collapse and enabling it to be repositioned or removed. A person of skill in the art can readily understand after reading the specification that the disclosed stent cannot be deformable; otherwise, it cannot be successfully repositioned or removed as described in the specification. Therefore, Celonova's proposed construction of the term "radially collapsed" is not necessary.

The prosecution history is another tool to supply the proper context for claim construction because it demonstrates how the inventor understood the invention. *Phillips*, 415 F.3d at 1317. In the prosecution history of the '475 Patent, the inventor repeatedly sought to distinguish his invention from the prior art[2] by arguing that the prior art discloses deformable, not radially collapsible, sleeves: "*Palmaz* prosthesis is made of deformable material that is expanded beyond its elastic limit, is not disclosed as being radially collapsible, is not disclosed as biased toward its collapsed position;" "*Palmaz* discloses a graft that is not radially collapsible

---

[2] U.S. Patent No. 4,733,665 issued to Palmaz.

9

and relies on deformation of its material when expanded." Wall counters that these statements were made in reference to different claims and a separate application.[3] However, the term "radially collapsed" is used consistently throughout the '475 Patent and the '122 Application. By arguing that *Palmaz* is distinguishable because it discloses deformable sleeves, the inventor would have assumed that a person of ordinary skill in the art will reasonably understand that the plain and ordinary meaning of "radially collapsed" sleeves are different from deformable sleeves. In addition, Wall does not provide support that the meaning of the term "radially collapsed" in Claim 30 of the '475 Patent should be constructed differently than in other claims of the '475 Patent or the '122 Application.

The court concludes that the evidence does not support a construction of this term in a way other than the plain and ordinary meaning of the words. The court concludes that **no construction of the claim term is necessary**.

3. "radially expanding"

The parties' proposed constructions of this term, as used in Claim 30 of the '475 Patent, are listed in the following table:

| Wall's Proposed Construction | Celonova's Proposed Construction |
|---|---|
| "increasing the extent, surface or bulk of the tube outwardly from a common center" | "radially expanding the sleeve without deforming the sleeve beyond its elastic limit" |

The parties agree that this term as used in the context of Claim 30 is very similar to the term "radially collapsed." Thus, for reasons substantially similar to those applicable to "radially collapsed," the court concludes that the evidence does not support a construction of this term in a

---

[3] Specifically, Wall contends that these statements are limited to Claims 8, 15, 17, and 18 of the '475 Patent, and Claim 1 of the U.S. Patent Application No. 10/293,122 ("the '122 Application"). The '122 Application is eventually combined with another co-pending application and issued as the '475 Patent.

way other than the plain and ordinary meaning of the words, because a person of ordinary skill in the art will understand that the disclosed stent will not be expanded beyond its elastic limit.

The court concludes that **no construction of the claim term is necessary**.

4. "sleeve"

The parties' proposed constructions of this term, as used in Claim 30 of the '475 Patent, are listed in the following table:

| Wall's Proposed Construction | Celonova's Proposed Construction |
|---|---|
| No construction necessary beyond the plain and ordinary meaning of the word<br><br>Alternatively, "a tube" | "a structure having a longitudinal discontinuity running the entire length of the structure; the structure is either biased towards a closed position and lockable in an open position, or biased in an open position and lockable in a closed position" |

Wall argues that the plain and ordinary meaning of the term "sleeve" is readily understood, and one of ordinary skill in that art would not need to look any further. Alternatively, Wall argues that the term should be construed as "a tube," because the sleeve described in the patent is tubular in shape. Celonova argues that it is the longitudinal discontinuity in the sleeve that allows the sleeve to contract and expand, which produces the desired flexibility of the claimed stent. The court agrees with Celonova that the term should be construed as a tubular structure having a discontinuity. However, the court also agrees with Wall that the rest of Celonova's proposed construction is redundant and unnecessary.

Representations made by the patentee in the specification of the '475 Patent require that "sleeve" refer to a tubular structure having a discontinuity. "When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007). In the

summary of the '475 Patent, the patentee states that "This invention provides a stent . . . the stent being in the form of a sleeve having a discontinuity so the sleeve has a collapsed position to be assumed during placement of the stent, and an expanded position for use in its final location for maintaining the desired opening." Thus, the specification of the '475 Patent limits the scope of the term "sleeve" to a tubular structure having a discontinuity.

Wall contends that "a longitudinal discontinuity" is not an inherent characteristic to be found in every sleeve recited in the '475 Patent. Wall correctly points out that the global description of the stent refers only to a "discontinuity," but not "a longitudinal discontinuity running the entire length of the structure." In addition, Celonova does not provide support for its proposed construction that the structure recited in Claim 30 is limited to stents with either "biased closed, locked open" or "biased open, locked closed" positions. The court further agrees with Wall that adopting Celonova's proposed construction in full will be redundant and difficult to understand.

Wall also argues that the inventor specifically recited in Claims 1 and 7 that the sleeve in those claims had a longitudinal discontinuity and declined to recite that same language in Claim 30, so that limitation should not apply. The "present invention" description is not so limiting when other intrinsic evidence suggests that invention reaches beyond that description. *See Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136–37 (Fed Cir. 2011). However, the court is not convinced that the global description should not apply to Claim 30. Claim 30 requires the stent has both an open position and a collapsed position, which falls within the language of the global description. No other intrinsic evidence suggests that the disclosed method in Claim 30 requires a stent beyond the global description being in the form of a sleeve having a discontinuity.

Therefore, the court concludes the construction of "sleeve" to be: **a tubular structure having a discontinuity**.

5. "mesh"

The parties' proposed constructions of this term, as used in Claim 30 of the '475 Patent, are listed in the following table:

| Wall's Proposed Construction | Celonova's Proposed Construction |
|---|---|
| No construction necessary beyond the plain and ordinary meaning of the word<br><br>Alternatively, "a network" | "knit or woven network" |

Wall asserts that no construction is necessary, or its construction is in accordance with the plain and ordinary meaning of the term as understood by a person of ordinary skill in the art. Celonova argues that the intrinsic evidence suggests that the '475 Patent describes "mesh" in the form of a "knit or woven network." The court agrees with Wall that no construction of the term is necessary.

One of ordinary skill in the art can readily understand the use of the word "mesh" in the context, and the construction of the term is unnecessary. There is no evidence that the patentee acted as his own lexicographer to define "mesh" in a specific way. Therefore, to conclude that the term requires construction beyond its plain and ordinary meaning, the court would need to find that "the specification [or prosecution history] makes clear that the invention does not include a particular feature or is clearly limited to a particular form of the invention." *Hill-Rom Servs.*, 755 F.3d at 1372. (internal citations and quotations omitted).

In support of its construction, Celonova points to the use of the term "mesh" in the summary of the invention ("knit or woven mesh") and the written description ("woven

network"). However, construing the term "mesh" to be "knit or woven network" will render the language as surplusage. *See, e.g., Nautilus Grp., Inc. v. Icon Health & Fitness, Inc.*, 82 Fed. Appx. 691, 694 (Fed. Cir. 2003) (finding error in district court's claim construction that rendered certain terms as "surplusage."); *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1578 (Fed. Cir. 1996) (avoiding claim construction that would render language as surplusage); *Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) (same). In addition, the specification does not teach that the mesh is limited to being knit or woven. When "woven network" is used in the specification, it is indicated that it is one manner of forming the mesh: "Though many different materials may be utilized in forming the stents of the present invention, one form of material is illustrated in **FIG. 5** . . . there is a woven network indicated at **31**." '475 Patent, 3:38–41. Therefore, the court does not find that the specification makes clear that the term "mesh" is clearly limited to a particular form.

Celonova also argues that "mesh" should not simply be construed to mean "network" because during prosecution the patentee replaced the claim language "a network" with "a mesh" to overcome the indefinite objection of the USPTO. The court agrees. Because the USPTO determined that the recitation of "having a network" fails to positively set forth the structural components that define the "network," the patentee amended the claim language to "formed in a mesh." The patentee cannot recapture what he has disclaimed during prosecution. *Omega Eng'g, Inc.*, 334 F.3d at 1323 (Fed. Cir. 2003).

Therefore, the court concludes that **no construction of the claim term is necessary**.

B.  *Alternative Agreed Constructions*

The parties dispute whether two terms in Claim 30 are indefinite. To the extent that either or both of these terms are not held indefinite, the parties have agreed to the corresponding alternative construction as listed in the table below.

| Claim Term/Phrase | Celonova's Position | Parties' Alternative Agreed Construction |
|---|---|---|
| "promoting epithelialization" | Indefinite | "promoting growth of epithelial cells around the sleeve and tis openings" |
| "retarding re-stenosis of the lumen with the sleeve" | Indefinite | "slowing or preventing the recurrence of the narrowing of the lumen with the sleeve" |

Celonova asserts that the two terms are indefinite because it is unclear to a person of skill in the art how to perform the biological steps of "promoting epithelialization" and "retarding re-stenosis," and because the '475 Patent provides no guidance or measure on how to discern whether these two steps have been effective. Wall argues that a person having ordinary skill in the art would understand that using a stent with openings like those described in Claim 30 would promote epithelialization and retards re-stenosis. The court agrees with Wall.

A patent is indefinite "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). The specification of the '475 Patent explains that the use of a stent with openings promotes epithelialization: "it will be understood that the use of a plurality of openings 34 promotes epithelialization to promote incorporation of the stent into the vessel well;" "the spaces

between the segments providing adequate openings for initial fluid drainage and subsequent epithelialization." Therefore, a person of ordinary skill in the art would reasonably understand that using the claimed stent with a plurality of openings in the lumen can promote epithelialization.

Celonova also argues that the '475 Patent provides no guidance to measure the effectiveness of the steps. A patent needs not explicitly include information that is already well known in the art. *Nautilus*, 134 S. Ct. at 2124. "[I]f a skilled person would choose an established method of measurement, that may be sufficient to defeat a claim of indefiniteness, even if that method is not set forth *in haec verba* in the patent itself." *Id.* (citing *Dow Chem. Co. v. Nova Chems. Corp.*, 809 F.3d 1223, 1224 (Fed. Cir. 2015)). The patentee explains in the information disclosure statement of the '475 Patent that it is known in the prior art that the use of a stent to keep the lumen open after a balloon angioplasty reduces the chance of re-stenosis. Therefore, the lack of description of the effectiveness of the steps alone does not render the terms indefinite.

Therefore, the court concludes that the two terms are not indefinite. The court adopts the agreed construction of those claim terms and construes the term "promoting epithelialization" to be: **promoting growth of epithelial cells around the sleeve and its openings**; the term "retarding re-stenosis of the lumen with the sleeve" to be: **slowing or preventing the recurrence of the narrowing of the lumen with the sleeve.**

C.  *Summary Table of Agreed and Disputed Terms*

| Term | Court's Construction |
|---|---|
| "coating" | material applied to the mesh for defining a plurality of openings throughout the mesh |
| "radially collapsed" | no construction of the claim term is necessary |
| "radially expanding" | no construction of the claim term is necessary |
| "sleeve" | a tubular structure having a discontinuity |
| "mesh" | no construction of the claim term is necessary |
| "promoting epithelialization" | promoting growth of epithelial cells around the sleeve and its openings |
| "retarding re-stenosis of the lumen with the sleeve" | slowing or preventing the recurrence of the narrowing of the lumen with the sleeve |

## IV. Conclusion

For the above reasons, the court construes the disputed claims as noted and so **ORDERS**. No other claim terms require construction.

**IT IS FURTHER ORDERED** that this case is set for a **Scheduling Conference** on **October 17, 2019, at 2:00 p.m.**, in Courtroom 7, Seventh Floor, United States Courthouse, 501 W. 5th Street, Austin, Texas 78701. If the case is not settled, the parties shall confer in an attempt to reach agreement on a schedule to follow for the remainder of the case. The court will render a scheduling order as a result of the conference.

SIGNED this 26th day of August, 2019.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE